# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

**DERRICK LATORY BROWN**                                         **PETITIONER**

**v.**                                                      **No. 2:08CV175-M-A**

**CHRISTOPHER EPPS, ET AL.**                                    **RESPONDENTS**

## MEMORANDUM OPINION

On January 3, 2007 Derrick Latory Brown, the petitioner, was convicted of selling cocaine in the Circuit Court of Tate County, Mississippi, and sentenced to fifteen years in the custody of the Mississippi Department of Corrections. Brown appealed his conviction to the Mississippi Supreme Court. The case was assigned to the court of appeals, which found that Brown's claim of error regarding hearsay evidence had merit; therefore, it reversed the trial court judgment and remanded the case for a new trial. Before the new trial began, the state filed a *writ of certiorari* with the Supreme Court of Mississippi, which was granted. The supreme court reversed the judgment of the court of appeals and reinstated and affirmed the judgment entered by the Circuit Court of Tate County. Brown then filed an Application For Leave To Proceed With Petition For Post Conviction Relief in Circuit Court, but was denied. This matter now comes before the court on the petition of Derrick Latory Brown, through counsel, for *habeas corpus* relief under 28 U.S.C. § 2254. The respondents have answered, and the petitioner has replied. The state argues that the petition should be denied for a failure to raise any meritorious claims on which *habeas corpus* relief could be granted. The court will, however, grant relief on Ground Two of the petition for the reasons set forth below.

**Facts Surrounding the Crime**

On November 3, 2003, Antonio Echols, a confidential informant for the Panola County Narcotics Task Force (Task Force), contacted Task Force Commander Jason Chrestman about the possibility of buying four ounces of crack cocaine from Elmer "Little Fudge" Armstrong. Officer Chrestman and the Task Force had used Echols as a Confidential informant on several occasions in the past. By the time Echols contacted Chrestman, Echols had already made telephone contact with Little Fudge, whom he had become acquainted with while incarcerated. Little Fudge, who resided in Tunica, placed Echols on a three-way call with two unidentified people to set up the drug deal. Although some previous court documents have stated otherwise, this conversation was not recorded. Chrestman wanted the drug buy to occur around Crenshaw, in northern Panola County, but either Little Fudge or the unidentified men refused to come to Panola County; therefore, the cocaine sale was to take place at Wal-Mart in Senatobia, Mississippi, the county seat of Tate County. This phone conversation was also not recorded.

After these initial conversations, Commander Chrestman told Echols to come to the Task Force headquarters to finalize the buy. After arriving at headquarters, Echols made the first recorded phone call to the unidentified man, who informed Echols that he had two ounces of crack cocaine to sell. Echols agreed to the buy and to provide a scale for weighing the cocaine. The unknown man informed Echols that he would arrive in a blue Chevrolet Monte Carlo. Echols was then searched by Task Force officials, wired, and given $1,600.00 with which to buy the drugs. Law enforcement officials took up positions around the Wal-Mart parking lot to provide surveillance for the controlled buy. Echols was then dropped off at the Wal-Mart parking lot where he waited for approximately two hours. During this time he placed four more

calls from the Wal-Mart parking lot to the man to inquire about his progress. In the second recorded phone call the unidentified man informed Echols that he had not yet left Tunica because Echols had neglected to tell him whether to bring the "hard" or "soft" form of cocaine. Echols responded that he wanted hard "crack" cocaine and inquired how long it would take the unknown man to arrive in Senatobia. The man said "Give me about 35 minutes." Echols then asked the unknown man what type of car he would be in, and again the man said the car would be a blue Monte Carlo. This is the only conversation where the informant or the unknown man alludes to the form of narcotics to be exchanged at the meeting.

Echols made a third recorded phone call within the two-hour window of the operation. The exact amount of time transpiring between that call and the previous conversation is unknown. The unknown man informed Echols that he had left Tunica and was now traveling in a white Oldsmobile Delta 88. Echols said that he would call the man in approximately twenty-five minutes. The fourth conversation is brief and consists only of the unknown man informing Echols that he will arrive in approximately ten minutes. Echols says "Alright Rick" at the conclusion of the conversation, but this identification does not reveal the speaker's identity because both men apprehended at the drug bust were named Derrick. The fifth recorded conversation contains statements made between Echols and the unknown man regarding their meeting place in the Wal-Mart parking lot. The two men agreed that they would meet near a small gas station in the south end of the Wal-Mart parking lot.

The Task Force recorded all calls through Echols' body wire. During trial, the Task Force's audiotape recording of Echols' phone conversations prior to the drug buy, as well as a transcript of the tape-recorded phone conversations, were admitted into evidence by the trial

court.  The quality of the tape is extremely poor.  Moreover, Echols and several law enforcement officers testified that the identity of the man with whom Echols was speaking is unknown.  After dropping Echols off, officers from the Task Force, the Drug Enforcement Agency in Oxford, and the Tate County Sheriff's Department positioned themselves in several locations in and near the Wal-Mart parking lot.  The officers observed a white Oldsmobile Delta 88 enter the parking lot of the Rascals gas station (BP) near the Wal-Mart parking lot.  A man wearing a red shirt stepped out of the white Delta 88 and entered the gas station, while the driver proceeded to Wal-Mart, where he approached Echols.  There is conflicting testimony on whether Brown drove directly to Echols or if Echols waved him down.  Echols opened the back passenger door of the car and the driver instructed him to get into the car; however, Echols refused, claiming that he had been robbed in the past.[1]  Instead, Echols showed the driver the money.  According to Echols' testimony, the driver then told him he would be right back.  The driver immediately returned to the BP and picked up the red-shirted man he had dropped off minutes earlier.  Both men then returned to the Wal-Mart parking lot to meet Echols.  When the two men pulled up to Echols, he got into the back seat of the Delta 88 and handed the passenger $1,600.00 in exchange for a plastic bag, which appeared to contain crack cocaine.  Law enforcement officers immediately descended on the car and arrested the driver (Derrick Brown), and the passenger wearing the red shirt (Derrick Black).  The plastic bag was sent to the Mississippi Crime Laboratory and found to contain 1.53 ounces of crack cocaine.  A video recording was introduced at trial depicting Brown picking up Black at the Rascals (BP) gas station and the post-buy arrest in the Wal-Mart parking

_____

[1]There is also conflicting testimony regarding whether the driver asked Echols to enter the vehicle.

lot.  The police found several cell phones, a box of sandwich bags in the trunk, and the $1,600 identified as the "buy money" inside the white Delta 88.  Agent Jamie Tedford of the Drug Enforcement Agency testified that it is normal for narcotics to be sealed in sandwich bags. Tedford also testified that he advised Brown of his Miranda rights and interviewed him.  Tedford testified that Brown told him Little Fudge had supplied the drugs – and gave a description of Little Fudge's vehicle and residence.

During the defendant's case-in-chief, Brown testified on his own behalf.  He said that on November 3, 2003, he had planned to go to Wal-Mart in Senatobia to place a Cadillac Escalade go-cart-like toy on layaway for his son.  According to Brown, Black had told him that he needed to go to Senatobia and asked Brown to drive because Black did not have a driver's license. When they arrived at the Rascals gas station (BP) and convenience store, Black asked to be dropped off.  Brown assumed Black had to use the restroom.  Brown dropped off Black and continued the few hundred feet to the Wal-Mart parking lot.  Brown claims that while driving through the Wal-Mart parking lot, Echols, a man Brown did not know prior to that day, flagged him down.  Echols showed Brown some money.  Brown immediately turned away from Echols and went back to the gas station to pick up Black.  Then, at Black's insistence, Brown and Black returned to the Wal-Mart parking lot and pulled up to Echols.  Echols got into the back seat of the car.  Black and Echols then completed the drug transaction.  Brown testified that he had not been aware that a drug sale would occur.  Brown said he would not have agreed to come to Senatobia with Black if he had known about the drug deal.  Brown said that Tedford asked him if he knew Elmer "Little Fudge" Armstrong – and that he said "yes" because "we basically went to school together, you know, from first grade all the way through."  Brown denies that he told

Tedford that the drugs were supplied by "Little Fudge" Armstrong.  There are no recordings or additional witnesses to lend credence to either side of this allegation.

### Procedural Posture

Brown was convicted on November 4, 2005, in Circuit Court of Tate County, Mississippi, for the sale of cocaine.  Brown was sentenced to serve a term of fifteen years in the custody of the Mississippi Department of Corrections, with nine years to serve and six years suspended.  *See* State Court record (S.C.R.), Vol. 1, p.75.  On June 6, 2006, the Mississippi Court of Appeals reversed Brown's conviction and remanded the case to the Tate County Circuit Court for a new trial.  *Brown v. State,* 969 So. 2d 891 (Miss. App. 2007), *reh'g denied,* May 29, 2007 (2005-KA-02291-COA).  The state appealed, and the Mississippi Supreme Court reversed the Court of Appeals, reinstated the judgment of the trial court, and affirmed the conviction and sentence.  *Brown v. State*, 969 So.2d 855 (Miss. 2007).  Brown, through different counsel, filed an Application to Proceed with Petition for Post-Conviction Relief in Circuit Court, as well as a Petition for Post-Conviction Relief Pursuant to MISS. CODE ANN. § 99-39-1, *et seq.*  Cause No. 2008-M-0078.  The Mississippi Supreme Court denied Brown's application on May 28, 2008.  Cause No. 2008-M-00708.  Brown is currently under the supervision of the Mississippi Department of Corrections after having been released on parole on February 12, 2009.  Under the state court judgment, Brown's sentence will expire on October 18, 2015.  Brown, through counsel, seeks federal *habeas corpus* relief in a petition filed with this court on July 22, 2008.

## Claims in State Court

Derrick Brown, through counsel, appealed his judgment of conviction and sentence to the

Mississippi Supreme Court, which referred the case to the Court of Appeals, assigning the

following error:

>   A.      Whether the trial court erred in overruling the appellant's objection to the
>   introduction into evidence of a tape recording of Antonio Echols and an
>   unknown individual and the transcript thereof.

>   B.      Whether the trial court erred in denying the Appellant's proposed jury
>   instruction D-5, an entrapment jury instruction.

On June 6, 2006, the Mississippi Court of Appeals reversed and remanded the matter to

the trial court.  The appeals court held that the narcotics task force's audiotape recording of the

confidential informant's telephone conversations with the unidentified person prior to the drug

sale should not have been admitted.  Further, the Mississippi Court of Appeals held that the trial

court's error in admitting the tapes substantially prejudiced defendant – and remanded the case

for a new trial.  *Brown v. State*, 969 So.2d 891 (Miss. App. 2007).  However the state's petition

for a *writ of certiorari* review was granted, and on November 29, 2007, the Mississippi Supreme

Court reversed the decision of the court of appeals, reinstated the judgment of the trial court, and

affirmed Brown's conviction and sentence.

Brown then filed an "Application for Leave to Proceed with Petition for Post-Conviction

Relief in Circuit Court" and an accompanying "Petition for a Post-Conviction Relief Pursuant to

Miss. Code Ann. § 99-39-1, et seq," in which he raised the following grounds:  ineffective

assistance of counsel, insufficiency of the evidence, and that the jury's verdict was against the

overwhelming weight of the evidence.  The Mississippi Supreme Court denied Brown's

application, holding that the conviction was supported by sufficient evidence, was not against the weight of the evidence, and that Brown's claim of ineffective assistance of counsel for failure to pursue these issues was without merit.

### Pursuit of Federal *Habeas Corpus* Relief

Brown, through counsel, seeks *habeas corpus* relief based upon the following grounds:

**Ground One:** The decision to convict Mr. Brown was based on insufficient evidence, an unreasonable determination of the facts presented in the state court, and contrary to *Jackson v. Virginia*.

**Ground Two:** Mr. Brown's Sixth Amendment rights to confrontation and cross-examination were violated when the trial court allowed audiotapes to be played to the jury, and this action is a clear deviation from the Supreme Court ruling in *Crawford v. Washington*.

Brown has exhausted his state court remedies as to both of the issues raised in the instant petition.

### Grounds Reviewed on the Merits in State Court

The Mississippi Supreme Court has already considered Grounds One and Two on the merits and decided those issues against the petitioner; hence, these claims are barred from *habeas* review by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), unless they meet one of its two exceptions:

(d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable

<blockquote>
determination of the facts in light of the evidence presented in the State court proceeding.
</blockquote>

*Id.* (emphasis added). The first exception, subsection (d)(1), applies to questions of law. *Morris v. Cain*, 186 F.3d 581 (5th Cir. 2000). The second exception, subsection (d)(2), applies to questions of fact. *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997). Since the petitioner's claims challenge both the application of law and the finding of fact, this court must consider the exceptions in both subsections.

Under subsection (d)(1), a petitioner's claim merits *habeas* review if its prior adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law." *Id.* (emphasis added). A state court's decision is *contrary to* federal law if it arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or if it decides a case differently from the Supreme Court on a set of "materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523 (2000). A state court's decision involves an *unreasonable application of* federal law if it identifies the correct governing principle but unreasonably (not just incorrectly) applies that principle to facts of the prisoner's case; this application of law to facts must be *objectively* unreasonable. *Id.* at 1521. As discussed below, the petitioner has shown that the Mississippi Supreme Court unreasonably applied the law to the facts, or that the court's decision contradicted federal law. *Accordingly, the exception in subsection (d)(1) applies to Ground Two of the instant petition, and the court will consider this claim on the merits.*

Under § 2254(d)(2) Grounds One and Two may merit review if those facts to which the supreme court applied the law were determined unreasonably in light of the evidence presented.

Because the supreme court is presumed to have determined the facts reasonably, it is the petitioner's burden to prove otherwise, and he must do so with clear and convincing evidence. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1). As discussed below, the petitioner has failed to meet this burden; as such, he cannot use subsection (d)(2) to move these claims beyond § 2254(d), which bars from *habeas corpus* review issues already decided on the merits.

### Ground One

In Ground One, Brown challenges the sufficiency of the evidence to support his conviction and sentence for the sale of cocaine. Insufficiency of the evidence can support a claim for habeas relief only if the evidence, when viewed in the light most favorable to the State, is such that no reasonable fact finder "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Fifth Circuit restated the standard under which the federal court must proceed in *Turner v. McKaskle*:

> "In determining whether there was sufficient evidence to support a state conviction, the Court must, considering all the evidence in the light most favorable to the prosecution, determine whether a rational fact finder could have found the defendant guilty beyond a reasonable doubt based on the record evidence presented at trial. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2789, 81 LED.2d 560 (1979). The court must refer to the substantive elements of the criminal offense as *defined by the state law*."

721 F.2d 999, 1000 (5th Cir. 1983) ( Emphasis Added ). Under Mississippi state law, the prosecution must prove:

(1) that on or about November 3, 2003 in Tate County, Mississippi,

(2) cocaine was sold to Antonio Echols, and

(3) that Derrick Brown "was present, consenting, knowingly aiding and abetting

or encouraging the commission of said elements of the crime."

S.C.R., Vol. 1, p.20.

In Mississippi, mere presence at the scene of the crime is not enough for a finding of guilt beyond a reasonable doubt. *Hughes v. State*, 983 So.2d 270, 276 (Miss. 2008). Mississippi law does not recognize guilt by association. *Davis v. State*, 586 So.2d 817, 821 (Miss. 1991) (citing Prior v. State, 239 So.2d 911, 912 (Miss. 1970)). Mere presence at the scene of a crime, even with the intent of assisting in the crime, is insufficient to sustain a conviction "unless the intention to assist was in some way communicated to the [principal actor.]" *Crawford v. State*, 133 Miss. 147, 141, 97 So. 534 (1923). In addition, "[p]roof that [a suspect] has stood by at the commission of a crime without taking any steps to prevent it does not alone indicate such participation or combination in the wrong done as to show criminal liability, although he approves of the act." *Harper v. State*, 83 Miss. 402, 415, 35 So. 572, 573 (1903) (quoting McClain on Criminal Law, ch. 15, sec. 194). These principles were also upheld in *Martin v. State*, 804 So.2d 967 (Miss. 2001) (J. Cobb) (Where the court found that the defendant's presence in the kitchen next to a large amount of marijuana, absent any other incriminating evidence, was insufficient to find he possessed the marijuana in any way). The Fifth Circuit rejects "the view that presence at the scene of the crime is alone sufficient proof of participating in, or perpetrating, the substantive offense." *See Turner*, 721 F.2d at 1002. Indeed, "adding inference to inference does not suffice to support the government's case, either." *Id*.

The Fifth Circuit has addressed a case that is factually similar to Brown's case, but interprets federal criminal statutes instead of state law. The court's reasoning in that case nonetheless sheds light on the current one. On September 7, 1995 Officer Garney pulled over a

Mazda 626 on Interstate 45 in Waco, Texas. *United States v. Stewart*, 145 F.3d 273, 277-78 (5th Cir. 1998). Defendant Stewart was driving the Mazda. *Id*. His passenger and co-defendant was Mr. Watson. *Id*. Officer Garney asked both men to step out of the vehicle, and both complied. *Id*. After some routine questions, Garney learned that Stewart's license was suspended. *Id*. The car belonged to Watson's girlfriend, who was not with the men, but both Watson and Stewart gave the officer consent to search the vehicle. *Id*. Upon the officer's search, he found two nine-millimeter handguns. *Id*. Watson was searched in accordance with his arrest, and the officers found 96 grams of cocaine in his underwear. The Fifth Circuit held that:

> Though Stewart's presence in the vehicle is a factor that, along with other evidence, may be relied upon to find that he aided and abetted Watson, mere presence at the crime scene and close association with the principal are insufficient standing alone to support a conviction for aiding and abetting another's crime. *Polk,* 56 F.3d at 620. Moreover, Stewart's presence in the vehicle and association with Watson are insufficient to support a reasonable inference that Stewart had any knowledge of the drugs. *See United States v. Menesses,* 962 F.2d 420, 427 (5th Cir.1992).

*Id.* at 277-78.

The Fifth Circuit reached the same conclusion on facts similar to the present case in *United States v. Gomez,* 776 F.2d 542 (5th Cir. 1985). In that case, three defendants, one of whom was Antonio Reyes Espinoza, were tried together on the charge of conspiracy to possess with the intent to distribute marijuana – and of aiding and abetting one another. *United States v. Gomez*, 776 F.2d 542 (5th Cir. 1985). The facts and outcome of this case, as it pertains to Espinoza, are important because the Fifth Circuit's treatment of the evidence is applicable to our current case. The parallels are clear:

> In the case of Espinoza, however, the inference of knowledge and participation cannot be made. One of the themes which runs through all of our cases involving

conspiracy is that *a defendant may not be convicted merely on a showing that he associated with individuals participating in a conspiracy, or by evidence that merely places him in "a climate of activity that reeks of something foul."* Examining the facts in this case in the light most favorable to the government, nothing more has been done than to place Espinoza in some very bad company. The key link in the government's evidence that is missing as to Espinoza is that he knew drugs were in the truck picked up by Gomez and delivered to Hartman. The government has proven only that Espinoza chauffeured Gomez and Hartman, who were involved in a conspiracy, and spent some time in a motel room with these individuals. A reasonable jury simply could not conclude beyond a reasonable doubt from these facts that Espinoza had the required knowledge. Espinoza's convictions must therefore be reversed.

*Id.* at 548-49 (emphasis added)(footnote omitted).

The present case can, however, be distinguished from the authority cited above. In those cases, the government produced *no* evidence that the defendants knew about the crimes or participated in them. In the present case, as far as the drug transaction itself, the prosecution proved only that Brown was present when Black exchanged the drugs for the money with the paid criminal informant. The state did, however, introduce testimony that Brown drove directly to the informant in the Wal-Mart parking lot, asked the informant (a stranger to him) to get into the car with him, returned soon after with Derrick Black, and that Brown knew the source of the crack cocaine to be his longtime acquaintance Little Fudge. If true, these facts (especially Brown's purported knowledge of the source of the crack cocaine) would indicate that Brown knew of the drug deal ahead of time – and participated in the transaction by driving Derrick Black to Wal-Mart to complete the deal. This evidence, though largely circumstantial, supports the state's contention that Brown knew ahead of time that the sale would take place.

The court instructed the jury that substantial prior knowledge of the drug transaction could be articulated by the participation in the sale or arrangement of the sale of controlled

substances.  This substantial knowledge, if proved, would render a defendant guilty "in that one

who aids and abets another in such a context is guilty as a principal." *Id.* at p. 21.  Jury

Instruction 9 explained that guilt could be established without proof that Brown personally

committed every act.  The jury was instructed that they could find Brown guilty if they believed

that he had either directed another to act, or joined another in the action with the intent to commit

the crime.  *Id.* at p.22.  However, the jury was also instructed that the accused must "deliberately

associate himself in some way with the crime and participate in it with the intent to bring about

the crime;" thus, mere presence at the scene of the crime and present knowledge that a crime is

occurring are not sufficient to establish a defendant either directed or aided and abetted the crime.

The prosecution needed to prove beyond reasonable doubt that the defendant was a participant in

the transaction – not merely a knowing spectator.  *Id*. at p. 21-22.  The prosecution introduced

enough evidence – barely – to prove its case.  As such, the petitioner's claims for *habeas corpus*

relief on Ground One will be denied.

**Ground Two**

The second ground brought by Brown concerns his Sixth Amendment right to  confront

and cross-examination the witnesses against him. "In all criminal prosecutions, the accused shall

enjoy the right to . . . be confronted with the witness against him."  U.S. CONST. amend. VI.

Brown argues that the introduction of the tape recorded telephone conversations and transcripts,

without identifying all persons speaking, prevented him from confronting and cross-examining

people who have provided incriminating evidence against him.  This argument is persuasive.

Improper admission of hearsay evidence violates the confrontation clause only when the

evidence was a crucial, critical, or highly significant factor in the framework of the whole trial.

*Cupit v. Whitley*, 28 F.3d 532, 537 (5th Cir. 1994). In evaluating a confrontation clause claim, the court must consider five general factors: (1) whether the hearsay evidence was "crucial" or " devastating;" (2) whether prosecutors misused a confession or otherwise engaged in misconduct; (3) whether a joint trial or the wholesale denial of cross-examination was involved; (4) whether the most important prosecution witness, as well as other prosecution witnesses, was available for cross-examination; and (5) the degree to which the hearsay evidence is supported by indicia of its reliability. *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997). The most important of the five factors are the first and the fifth – whether the evidence was "crucial" or "devastating," and whether it is supported by indicia of reliability." *Id.* at 446.

As discussed below, the audio recordings in question are clearly hearsay. Therefore, the court must apply the five factors set forth above to evaluate Brown's claim that the state violated his right to confront the witnesses against him. Regarding factor one, the hearsay evidence was the strongest evidence used to suggest that Brown had knowledge of the impending drug deal. As shown above, the other evidence was both circumstantial and came mostly from a paid confidential informant who, shortly after he assisted the police with the drug arrest in question, was convicted of armed robbery. Thus, the recordings were "crucial" to the state's case and "devastating" to Brown's claimed lack of knowledge. Factors two and three are not relevant and will not be discussed. Admission of the audio recordings into the record satisfies the fourth factor, because the recordings were the prosecution's most important and damaging evidence supporting Brown's knowledge of the drug deal. Brown was thus not allowed to cross-examine the prosecution's star witness (the unidentified person on the tape) – to the great detriment of his defense. The fifth factor speaks for itself. There is no way to credit the reliability of statements

-15-

made by an unknown person, who is unavailable to testify in court, pertaining to Brown's knowledge of the illegal drug sale. Indeed, although the unknown speaker made veiled references to the impending drug deal, he never made a single statement indicating that Brown was privy to such knowledge.

To analyze this claim further, we must review the state court's finding that the tape was not hearsay. "What is not hearsay evidence in a state court trial is governed by state law." *Gochicoa* 118 F.3d at 445. The state court analyzed the issue under MISS. R. EV. 801(c) and found that statements made on the recording were not admitted for the truth of the matter asserted and therefore could be admitted into evidence. The court discussed the issue in detail:

> Mississippi Rule Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Stated another way, an out-of-court statement is not hearsay unless the party offering the statement is attempting to prove that the statement is true. While it is true that neither the C.I. nor the law enforcement officers who testified for the state court identified Brown's voice on the tape, the failure to identify Brown does not render the tape inadmissible.
>
> In fact, the tape was offered to prove the pre-arrangement conversations had taken place, as Echols and other law enforcement officers had previously testified. In effect the audiotape corroborated the various witnesses' testimony. Therefore, sufficient testimony existed to admit the tape for the purpose of proving that the conversations had taken place as well as the gist of the conversations.
>
> The audiotape was not offered to show that Brown was involved in the pre-arrangement conversations, nor could it have been. A careful review of every word and sentence on the audiotape reveals no statement, which the State needed to prove as true. The tape contained such utterances as, "Ain't got to left" . . . "I want it hard man" . . . "Yeah, I'm with my bride but I'm going to be walking out where I can see you man." The State had no need to prove these statements, or any of the other statements on the audiotape, were true. Thus the statements were not hearsay, and the trial court properly overruled Brown's hearsay objection.

*Brown*, 969 So.2d at 861.

Brown argues that the introduction of the audio recordings violated his right to confront the unknown witness as stated in *Crawford v. Washington*, 541 U.S. 36, 51 (2004). *Crawford* applies when hearsay evidence that is testimonial in nature is offered against an accused who does not have an opportunity to cross-examine the declarant of the hearsay at the time it was admitted. *Id*. The Court declined to provide a comprehensive definition of what is testimonial, holding only that "[t]estimony . . . is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id*. The state argues that the audiotape recordings are not hearsay because the state court found they were not offered to prove the truth of the matter asserted, and they had no need to prove such statements.

That argument fails in light of the evidence before the court. The first two conversations were extremely incriminating and appear to have taken place at the unknown man's house. In those conversations Echols and the unknown man discussed: (1) conducting a drug deal, (2) the type and color of the vehicle to be used during the drug deal, (3) whether Echols wanted crack or powder cocaine, (4) who would bring the scales for weighing the cocaine, (5) where the drug deal would take place, and (6) when the unknown man would get there. The state offered no proof that Derrick Brown even overheard those conversations, much less participated in them. The statements had no evidentiary value whatsoever as to Brown – unless the state wanted the jury to believe that Brown either made the incriminating statements, or overheard them – thus assuming, without evidence, that Brown was guilty because he had knowledge of the plan to sell cocaine. Assuming a defendant's guilt flies in the face of the bedrock of American criminal jurisprudence – the presumption of innocence.

The state in the instant case had the burden to prove the truthfulness of statements made on the audio recordings – a burden the state may not transfer to the defendant. Moreover, the recording is clearly testimonial because the tape was offered to corroborate the various witnesses' testimony – and to prove the content – the "gist" – of the conversations, to borrow the term from the trial judge. This is the very definition of "prov[ing] the truth of the matter asserted." In *Crawford* the court explained, "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had prior opportunity to cross-examine" *Id*. at 59. The identity of the declarant speaking with the confidential informant on the recordings is unknown; therefore, Brown had no opportunity to confront or cross-examine the man at any point during the case.

In addition, the state court found that the audiotape was not offered to show that Brown was involved in the prearrangement conversations. This is simply not the case. Indeed, *the prosecuting attorney herself* stated in the post-trial proceedings that Brown's knowing involvement is precisely what a person must infer from the audio recordings.

**Prosecuting Attorney:**

I have reviewed again the transcripts of those phone conversations. Basically those conversations are conversations setting up the deal. That it is clear from the transcript that those conversations took place while the individuals were getting in the car coming to Tate County from Tunica County . . . . *So it is clear from all the evidence that the two – that the two – that the C.I. was, in fact, talking to either the defendant or his partner in the case.*

T.T. 129-130. (emphasis added). Unfortunately for the prosecutor, there is absolutely no evidence in the record to support her conclusion that either Brown or Black was on that tape. The recorded conversations make clear that during the first two recordings the unknown speakers

are at someone's house in Tunica, *not* in the car on the way to the meeting place in Wal-Mart.

All of the potentially incriminating statements were made on those first two recordings, and none

were made in the later recordings that apparently took place on the trip to Wal-Mart. Thus, even

if one were to assume that Brown overheard the statements in the car, nothing in the later

statements would tend to prove that he knew anything about the planned drug deal. Hearsay

testimony is prohibited to prevent just this sort of assumption; the prohibition against hearsay

allows the accused to face his accuser and challenge the testimony against him. Derrick Brown

never had that opportunity.

The Mississippi Supreme Court erroneously held that the state "was under no obligation

to determine the identity of those persons whose voices were on the tape" and if Brown believed

the voices on the tape were someone other than himself, then he could have subpoenaed anyone

he desired. *Brown*, 969 So.2d at 862. This is a flawed understanding of the law. It shifts the

burden of proof to Brown (the defendant) and assumes *without evidence* that Brown knows the

identity of the speakers on the recording. Justice Diaz's dissent to the majority opinion of the

Mississippi Supreme Court highlights the trial court's error.

### Excerpt from Justice Diaz's Dissent

First, the opinion grossly misstates the law and improperly shifts the burden of
proof onto the defendant by holding that "[t]he State was under no obligation to
determine the identity of those persons whose voices were on the tape," and that
Brown "could have subpoenaed anyone he so desired." Such a holding is directly
contrary to the fundamental concept in criminal law that "it is the State's burden
to put on witnesses to establish guilt." *Fox v. State,* 756 So.2d 753, 762
(Miss.2000) (citing *McVeay v. State,* 355 So.2d 1389 (Miss.1978)). The majority
assumes that Brown knew the identity of the individuals on the tape, which, in
turn, assumes his guilt. In other words, Brown must prove his innocence before
he may claim any right to confront the witnesses against him. The law prohibits
the prosecution from commenting on the failure of the defendant to call a witness,

and this Court cannot use such reasoning to find that a defendant's constitutional right to confront the witnesses against him was not violated. *See Ross v. State,* 603 So.2d 857, 864 (Miss.1992) ("the failure of either party to examine a witness equally accessible to both parties is not a proper subject for comment before a jury") (quoting *Brown v. State,* 200 Miss. 881, 887, 27 So.2d 838, 840 (1946)).

Second, as the proponent of the evidence, the State has "the burden of laying the proper foundation for the evidence." *Buford v. Riverboat Corp.,* 756 So.2d 765, 770 (Miss.2000). Because the identity of the voices goes directly to the foundation of the evidence, the State most certainly had some obligation to determine their source. Again, this holding improperly shifts the burden of proof onto the defendant.

*Brown v. State*, 969 So.2d 855, 899 (Miss. 2007) (Diaz, O., dissenting).

Cross-examination offers the accused the ability to test the bias, credibility, memory, and interests of a witness against him. The United States Supreme Court highlights the critical nature of a defendant's ability to cross-examine those testifying against him:

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness's perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness.

*Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S.Ct 1105, 39 LED.2d 347 (1974). Likewise, in

*Pointer v. Texas*, the Court condemned the trial court's decision to admit testimony from a

declarant who was unavailable for cross-examination:

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.

*Pointer v. Texas*, 380 U.S. 400, 401, 85 S.Ct. 1065, 1068, 13 LED.2d 923 (1965).

The prosecution in the present case never identified the person featured on the audio recordings – or established that Brown knew the speaker or the content of the taped conversations.  As such, Brown never had the opportunity to cross-examine this witness, despite his attorney's hearsay objections.  The trial court's deviation from this fundamental legal principle led to the introduction of the highly prejudicial tape-recorded hearsay.

The court also misinterpreted the prejudicial evidence – likely as a result of the introduction of testimony without the possibility to cross-examine the witness.

**The Court:**

Well, (if) my memory serves me that the two co-defendants were in the car leaving Tunica when the tape started; is that---

**Defendant's Attorney:**

This is a telephone conversation tape, judge. That may be where I got you confused.

**Prosecuting Attorney:**

That's what I am talking about too. My recollection of the facts and the testimony – the totality of the testimony was they didn't know as between Mr. Black or Mr. Brown, which one of the two of them were on the phone, but it would have had to have been one of the two of them.

**Defendant's Attorney:**

I don't agree with that because I asked them specifically who was on the tape with the informer and they said they don't know. They could have said, well, it was Mr. Brown or it was the other man and they didn't say that. So I disagree with that analysis of it . . . but any way, that's the best argument I can make and I'll move onto something else.

T.T. 126.

This excerpt shows that both the lawyers and the judge were unaware that the first two recorded phone calls took place before the unknown man departed for Senatobia. The second phone call is the only one that contains incriminating statements. At the beginning of the second conversation, the unknown man states that he is still at his house because Echols has not specified what type of cocaine to bring to the drug deal. The state has no way of knowing if Brown was present during the first two phone calls – because the unknown man had not yet left for Senatobia. It is not rational to make the inference that Brown was present for the telephone call at the unknown speaker's house simply because he shared a car with Black *later that day*. It is reasonable to infer that Brown was at least present for the final three recorded calls because of the information provided by the unknown man and facts that were observed at the time of the arrest (*e.g.,* description of the car and the unknown man's estimated time of arrival). However, it is not reasonable to assume that Brown must have been present for the first two calls without any evidence to support that assumption. Nothing spoken by either party in the final three conversations was indicative of a drug deal. The only topics discussed during the final three calls were the type of vehicle in which the seller would arrive, estimated time of arrival, and the exact location of the meeting. As discussed above, the state prosecutor's misunderstanding of these facts is shown in her concluding statements during the post conviction hearing.

Under Mississippi law, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MISS. R. EV. 801(c). The information to be gleaned from the first two recorded conversations was extremely incriminating – for the unknown participants in those conversations – but not for Derrick Brown. For the purposes of Derrick Brown's criminal trial, these

statements were used to prove the truth of the speakers' words.  They were pure hearsay.  The state did not know whether Derrick Brown, Derrick Black, or some other person made or heard the recorded incriminating statements.  As such, the state could not properly introduce the recorded conversations a into evidence against Derrick Brown over his objection.  In doing so, they improperly invited the jury to presume that Derrick Brown either participated in the incriminating conversations – or at least overheard them – and thus had knowledge of the drug deal.

Cross-examination prevents the distortion of evidence presented at trial – so that the evidence is more likely to reflect the truth – what actually occurred.  The prejudicial effect from the introduction of the taped conversations permeated the entire trial.  The other evidence supporting the state's contention that Brown had prior knowledge of the drug deal was sketchy, at best.  While the state might have secured Brown's conviction on such weak evidence, the state might also have failed.  Introduction of the recorded statements and transcripts of the unknown man bolstered the admissible evidence by use of inadmissible hearsay – hearsay intended to act as substantive evidence of Derrick Brown's guilt.  Admission of that hearsay into evidence violated his Sixth Amendment right to confront and cross-examine his accuser.  The trial court's decision to admit that evidence was therefore an unreasonable application of clearly established federal law.  Derrick Brown's request for *habeas corpus* relief in Ground Two of the instant petition will therefore be granted.

## Remedy

For the reasons set forth above, the Derrick Brown's claim for relief based upon Ground One (insufficiency of the evidence) will be denied.  However, Brown has demonstrated that his

claim for *habeas corpus* relief in Ground Two (violation of his Sixth Amendment right to confrontation and cross-examination of adverse witnesses) is well taken and will be granted. The judgment of the trial court will be vacated. Derrick Brown has been released from incarceration and is currently on probation. The state must initiate a new trial on these charges against the petitioner within 120 days. If the state does not initiate such proceedings within that time, then Derrick Latory Brown must be released from all custody, including probation. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this the 20th day of December, 2010.

**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**